Filed 11/26/13  P. v. Dixon CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055447 |
| v. | (Super.Ct.Nos. INF059558, INF059720 & INF059872) |
| CHRISTOPHER LEE DIXON et al., | |
| Defendant and Appellant. | OPINION |

APPEAL from the Superior Court of Riverside County.  Ronald L. Johnson, Judge.  (Retired judge of the San Diego Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed with directions.

David M. McKinney, under appointment by the Court of Appeal, for Defendant and Appellant Darryl Pulling.

Sharon M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant Christopher Lee Dixon.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton, and Karl T. Terp,

1

Deputy Attorneys General, for Plaintiff and Respondent.

I

INTRODUCTION[1]

This appeal involves three bank robberies and two defendants, Darryl Pulling and Christopher L. Dixon. Dixon committed one bank robbery in June 2007 and another in July 2007. Dixon, Pulling, and Dixon's sister, Teresa,[2] committed a third bank robbery in August 2007. The June and August robberies were of the same bank, the Guaranty Bank and Trust (Guaranty Bank) in Desert Hot Springs. The July robbery was of a Bank of America branch inside a grocery store in Palm Desert. Pulling and Dixon were apprehended while fleeing from the August robbery. Dixon confessed to all three robberies.

Separate juries convicted Dixon in three trials.[3] A court sentenced him to three consecutive sentences—20 years four months, four years four months, and four years four months—a total of 29 years. After a jury convicted Pulling for the August 2007 robbery, the court sentenced him to a total prison term of 28 years.

Pulling asserts eight arguments: two issues challenging his admission to a prior conviction in New York; two sentencing issues; three issues addressing the gun-use

---

[1] All statutory references are to the Penal Code unless stated otherwise.

[2] Teresa Dixon is not a party to this appeal.

[3] The first trial involved the August 2007 robbery, the second trial the June 2007 robbery, and the third trial the July 2007 robbery.

enhancement and instruction on it; and the denial of his *Pitchess*[4] motion. Both Pulling and Dixon challenge the denial of Pulling's *Batson/Wheeler*[5] motion during the trial of the August 2007 robbery. Dixon also asks this court to review the materials considered by the trial court after granting his *Pitchess* motion and finding no discoverable material before the first trial. Additionally, Dixon challenges the admission during the second trial of his confession to the June robbery. Except for Dixon's *Pitchess* claim and one of Pulling's sentencing issues, defendants' claims lack merit. We affirm the judgments with modifications.

II

STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

A. *The August 2007 Robbery* (*Case No. INF059558*)

Around 2:00 p.m. on August 16, 2007, Thomas Librizzi, a bank employee, saw two people with guns outside the Guaranty Bank. One gunman had hidden his face with cloth. Librizzi yelled "robbery" and one of the tellers yelled, "Oh, shit, not again." Librizzi was able to move the bank manager and a teller into a secure backroom but Librizzi did not have time to warn the other teller, Joanna Blackstone. In the backroom, Librizzi watched on a closed-circuit security monitor as the two robbers pointed their guns at Blackstone.

---

[4] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

[5] *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*); *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*).

3

Blackstone recalled Librizzi ushering the other teller into the back room before the two men confronted Blackstone, pointing guns in her face. One of the robbers kept a gun pointed at Blackstone while the other robber paced back and forth in the lobby. The first robber had a shirt wrapped around his face and demanded, "Give me all your money," while threatening to shoot her in the face and telling her to fill a plastic bag with money. Blackstone filled the bag with money from her drawer—but not the exploding dye pack—because he threatened her, saying, "I don't want any bullshit. Don't give me any bullshit." Meanwhile, the second robber paced back and forth and told her she was taking too long. The first robber told her he would shoot her "pretty little face" and she would die if she did not hurry. After Blackstone emptied her drawer, the robber demanded more. Blackstone told the robber she had no more money, and he responded, "Too bad. Now you're going to die, you going to have to die." She gave the robber all of the money from another drawer, including the exploding dye pack. The robber told her she was "lucky" and she could "live today." Blackstone estimated she gave them approximately $11,000 from two bank drawers.

Both Librizzi and Blackstone described one of the robbers covering his face with a light-colored fabric and the other robber wearing a red and white hat. The robber who held the gun in Blackstone's face was approximately six feet tall but she could not estimate the height of the second robber. Librizzi estimated one of the robbers was approximately 5 feet 5 inches tall, and the other 5 feet 8 inches tall. Blackstone believed both robbers were African-American from their speech.

The entire robbery lasted less than five minutes. After the robbers left the bank, Blackstone saw dirt kicked up from a car speeding quickly out of the parking lot.

Several Desert Hot Springs police officers responded to a call regarding the robbery and pursued the suspected bank robbers, driving a blue Mitsubishi, at high speed through a residential neighborhood. The pursuit ended in a parking lot. Dixon exited the front seat with a shotgun and aimed it in the officers' direction. After an exchange of gunfire, Dixon fled the scene on foot.

An officer saw Dixon jump a wooden fence into the backyard of a duplex and flee with the shotgun wrapped in a black shirt. The foot pursuit continued until the police captured Dixon when he became wedged between a shed and a house. The police recovered the rifle. Dixon had a baggie of methamphetamine in his pocket.

Pulling was sitting in the back seat of the Mitsubishi and Teresa Dixon, was sitting in the driver's seat. The back of the car contained a ski mask, gloves, a bag of money, and a .22-caliber sawed-off rifle with a handle grip. Later, a crime scene investigator processed the Mitsubishi and, in the front seat, found a purse, a Denny's bag stained with red dye, and an additional amount of money in the center console. Also in the front seat, the investigator found gloves and a long-sleeved gray shirt. In the rear seat, the investigator found a red and white baseball cap with the number 23 on it, a pair of black shorts with a white stripe down the side, a black shirt, a black ski mask and a bottle of brandy.

Pulling was handcuffed and searched before being placed in the back of a squad car for transport to the police department. Later, after Pulling was removed, the police

5

found two gloves with red dye, a red Angels baseball cap, and money with red dye inside the cap in the back of the squad car where Pulling had been sitting.

At the house where the dye pack had exploded, dye-stained money was scattered about the yard. The investigator also found a black T-shirt in the side yard. Dixon's clothes included a pair of white tennis shoes with red dye on them. Pulling's clothing included a pair of denim blue jeans with a red stain on them. Inside the right front pocket of Pulling's pants was a faded red dye stain.

The money found in the Denny's bag totaled $8,598. The money inside the ball cap found in the squad car totaled $2,590. The money on the ground totaled $215. The total amount of money was $11,403.

When he was interviewed by Detective Essex, Dixon acknowledged going into the Guaranty Bank while armed and ordering the teller to fill a bag with money. He denied threatening the teller, claiming he simply told her to put the money in the bag. After receiving the money, he called his sister for a ride. The police chase ensued, while he urged his sister to "Go, go, go, go," and told her where to turn. Dixon admitted leaving the car with the shotgun and fleeing but he denied firing any shots at the officers. Dixon repeatedly stated he had gotten high on the day of the robbery—and "did some dumb shit"—but his sister did not know what was happening.

Dixon was found in possession of 1.40 grams of cocaine base. There was no gunshot residue on either his right or left hand. Pulling claimed the evidence found in the back seat of the squad car was planted.

In count 1, Pulling and Dixon were charged with robbery. (§ 211.) In count 2, Dixon was charged with reckless evasion of a police officer. (Veh. Code, § 2800.2.) Count 3 charged both Pulling and Dixon with exhibiting a firearm to resist arrest. (§ 417.8.) Count 4 charged Dixon with being a felon in possession of a firearm. (§ 12021, subd. (a)(1).) The information alleged that Pulling and Dixon used a firearm during the commission of the robbery. (§ 12022.53, subd. (b).) The information also alleged Dixon had served three prior prison terms.[6] The information further alleged Pulling had a prior strike conviction (§ 667, subds. (c) & (e)(1) and § 1170.12, subd. (c)(1)); had been convicted of a prior serious felony (§ 667, subd. (a)); had served a prior prison term for a violent felony (§ 667.5, subd. (a));[7] and had served a prior prison term.[8] (§ 667.5, subd. (b).)

The trial court denied Pulling's *Pitchess* motion. After a jury trial between August 11, 2011, and August 18, 2011, a jury found Dixon guilty of all charges and made true findings on the weapons use enhancement. The jury found Pulling guilty of robbery and made a true finding on the weapons use enhancement but found Pulling not guilty of

---

[6] Dixon served a prior prison term following: (1) his January 9, 2003 conviction of being a felon in possession of a firearm; (2) his April 13, 2004 conviction of receiving stolen property; and (3) his June 7, 2005 conviction of possession of a controlled substance.

[7] An October 5, 1998 New York conviction for first degree robbery, a serious and violent felony. (NY Penal Law, § 160.15.)

[8] A 2000 New York conviction for attempted possession of dangerous contraband in prison. The reference to New York Penal Law 202.25, which does not exist, appears to refer to New York Penal Law section 205.25, prohibiting prison contraband in the first degree.

count 3.  Dixon admitted the prior conviction allegations.  Pulling admitted his prior strike and conviction allegations.  The court sentenced Dixon to a prison term of 20 years four months.  The court sentenced Pulling under the two-strikes sentencing scheme to a prison term of 28 years.

B.  *The June 2007 Robbery* (*Case No. INF059720*)

Around 12:45 p.m. on June 28, 2007, Rebecca Cassano was waiting in her truck in the parking lot of the Guaranty Bank.  A man yelling loudly exited the passenger side of a red Honda Civic.  His face was hidden by a white cloth or T-shirt wrapped around his head and he carried a black gun.  Because he wore a short-sleeved shirt, she could tell he was African-American.  The man was about six feet tall and weighed between 150 and 180 pounds.  The man went inside the Guaranty Bank, leaving the car engine running.  Cassano recorded the license plate number.

When the armed man entered, the bank manager, Ryan Simister, was in his glass-enclosed office with a client.  The man wore dark pants and a light-colored long-sleeved shirt.  He had tied a gray sweatshirt around his head so that his face could not be seen.  Simister could not identify the robber's race.  Simister estimated the man was 5 feet 11 inches tall, weighing approximately 170 pounds.  As the man approached Simister, he yelled, "Die, mother fucker," and repeated this phrase throughout the robbery.  The man entered Simister's office, pointed the gun directly at him, and placed the gun against his head.  Simister, a gun owner, described the weapon as a large, black handgun which was not a toy.  The man ordered Simister to go to the cash vault and teller area.  At the merchant teller window, Simister emptied the contents of the top two drawers into a bag

8

the man gave him. In total, the robber took approximately $20,000 and left immediately after Simister filled the bag the second time.

As Cassano lay on the front seat of her truck, she heard the robber leave. She noticed the grinding gears as the car backed out of the parking stall.

When officers located the car, they found clothing—a skullcap, gloves, and other items—strewn about the car and in a nearby dumpster. They did not find any real or toy guns.

On August 20, 2007, Detective Essex interviewed Dixon twice and, during the second interview, Dixon confessed to committing the June robbery. He claimed he had used a toy gun which he discarded in a dumpster. Dixon said the abandoned getaway car was a "pile of crap" that did not run well.

Dixon was charged in count 1 with kidnapping for robbery (§ 209, subd. (b)(1)); in count 2 with robbery (§ 211); and in count 3 with burglary (§ 459). The information further alleged regarding counts 1 and 2 that Dixon personally used a firearm (§ 12022.53, subd. (b) and § 1192.7, subd. (c)(8)) and that Dixon had served three prior prison terms. (§ 667.5, subd. (b).) The trial court granted Dixon's motion to set aside count 1 for aggravated kidnapping.

In the August 2011 trial of the June 2007 robbery, the jury heard evidence about the July and August 2007 robberies, including Dixon's confessions. (Evid. Code, § 1101, subd. (b).) The jury found Dixon guilty on counts 2 and 3, with true findings on the enhancement allegations, and Dixon admitted the prior prison term allegations. The court

sentenced Dixon to a sentence of four years four months consecutive to the sentence for the August 2007 crimes.

*C. The July 2007 Robbery* (*Case No. INF059872*)

Guadalupe Lopez worked as a teller in the Bank of America branch in a grocery store in Palm Desert. On July 28, 2007, a man with a cloth wrapped around his face pointed a gun at her and demanded money. Lopez gave him money from both her top and bottom cash drawers, which he put into a bag. The robber went to the next teller window where Jessica Lawson, another teller, was helping a customer. The robber pointed the gun at the customer, then pointed the gun at Lawson and demanded money from her, which she gave him along with exploding dye packs.

Both tellers recalled the robber coming into the bank earlier in the day. He wore dark-colored baggy sweatpants and a long sleeved sweatshirt, which was unusual for such a warm day. He wanted to open a bank account but could not provide a social security number. Lawson later identified Dixon from a photographic lineup. Surveillance video captured images of Dixon in the bank earlier and the robber later in the day.

On August 17, 2007, Dixon confessed to committing the July robbery. During an interview with Detective Essex on August 20, 2007, Dixon again admitted committing the July robbery.

Dixon was charged with robbery, the personal use of a firearm, and having served three prior prison terms. In the September 2011 trial of the July robbery, the jury heard evidence about the June and August robberies, including defendant's admissions. (Evid.

10

Code, § 1101, subd. (b).)  The jury convicted Dixon, who admitted the prior prison term allegations.  The court ordered Dixon to serve a sentence of four years four months consecutive to the sentences for the June and August crimes.

III

PULLING'S NEW YORK PRIOR STRIKE

Instead of having a bifurcated court trial on the prior conviction and prison term allegations, Pulling agreed to waive trial and admit the four allegations of priors.  Pulling admitted he was convicted in New York State, on October 5, 1998, of the felony of first degree robbery, in violation of New York Penal Law section 160.15.[9]  He also admitted the robbery was a serious and violent felony—within the meaning of sections 667, subdivisions (c) and (e), and 1170.12, subdivision (c)(1)—and a serious felony—within the meaning of section 667, subdivision (a).  Pulling additionally admitted he had served a separate term in state prison and did not remain free of prison custody, and had committed an offense resulting in a felony conviction within 10 years, within the meaning of section 667.5, subdivision (a).  Finally, Pulling admitted he was convicted on February 22, 2000, in New York for the felony of attempted possession of dangerous

---

[9]  "A person is guilty of robbery in the first degree when he forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime:  [¶]  1. Causes serious physical injury to any person who is not a participant in the crime; or [¶] 2. Is armed with a deadly weapon; or [¶] 3. Uses or threatens the immediate use of a dangerous instrument; or [¶] 4. Displays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; . . .  [¶]  Robbery in the first degree is a class B felony."  (N.Y. Penal Law § 160.15 (McKinney).)

contraband in prison, in violation of New York Penal Law section 205.25,[10] and thereafter served a separate term in state prison for that offense, did not remain free of prison custody, and committed an offense resulting in a felony conviction during a period of five years subsequent to the conclusion of that term, within the meaning of section 667.5, subdivision (b).

Pulling first contends the trial court erred when it accepted his admission of the 1998 New York robbery conviction as constituting both a strike (§§ 667, subds. (c) & (e), and 1170.12) and also as a serious felony prior (§ 667, subd. (a)). Second, Pulling argues the court did not properly admonish him about his constitutional rights before accepting his waiver of a jury trial. The People contends both claims lack merit because Pulling's admissions at the end of trial acknowledged every element necessary to establish his New York robbery as a strike, and consideration of the totality of the record establishes he gave a knowing waiver of his right to jury trial on his prior conviction allegations. We agree with the People.

The court in *People v. Bowie* (1992) 11 Cal.App.4th 1263, 1266, acknowledged, "A defendant's guilty plea or admission of a sentence enhancement allegation is deemed to constitute a judicial admission of every element of the offense charged and severely restricts the defendant's right to appeal from the ensuing judgment." As demonstrated

---

[10] "A person is guilty of promoting prison contraband in the first degree when: [¶] 1. He knowingly and unlawfully introduces any dangerous contraband into a detention facility; or [¶] 2. Being a person confined in a detention facility, he knowingly and unlawfully makes, obtains or possesses any dangerous contraband. Promoting prison contraband in the first degree is a class D felony. (N.Y. Penal Law § 205.25 (McKinney).)

12

above, after discussing the prior conviction allegations with his counsel, Pulling made binding admissions about his 1998 New York robbery conviction within the meaning of the pertinent sections of the Penal Code. (*People v. Thomas* (1986) 41 Cal.3d 837, 842-843, 844-845; *People v. Richard* (1987) 189 Cal.App.3d 1159, 1162.) Pulling's admissions severely restricted any contrary argument on appeal. (*People v. Jones* (2009) 178 Cal.App.4th 853, 859, fn. 3; *Bowie, supra*, 11 Cal.App.4th at p. 1266.)

None of the authorities Pulling cites involve express admissions by the defendant. (*People v. Avery* (2002) 27 Cal.4th 49; *People v. Guerrero* (1988) 44 Cal.3d 343; *People v. James* (2001) 91 Cal.App.4th 1147; *People v. Mumm* (2002) 98 Cal.App.4th 812; *People v. Purata* (1996) 42 Cal.App.4th 489.) The additional case cited by Pulling in his reply brief, *People v. Roberts* (2011) 195 Cal.App.4th 1106, 1122, involved a defendant who had "made no admission that he had committed a strike offense." In contrast, these cases do not apply because Pulling admitted every factual element required to establish the enhancements. (*People v. Thomas, supra*, 41 Cal.3d at pp. 843-844.)

Admission of an enhancement is subject to the same principles as a guilty plea for a charged offense. (*People v. Lobaugh* (1987) 188 Cal.App.3d 780, 785; see also *People v. Thomas, supra*, 41 Cal.3d at pp. 842-844.) We reject Pulling's assertion that "the People still have the burden of proving the foreign conviction is the equivalent of the California offense, even where the defendant [has] admitted the conviction." Pulling argues the offense of robbery in New York differs from robbery as defined in California because under certain circumstances the defense of claim of right may not be available in New York when it might be available in California. The record of the 1998 robbery is

13

silent about whether Pulling "forcefully took property from another, in the good faith belief that the property was his . . . own." These points, however, do not apply because defendant admitted each element of the offense.

After Pulling admitted the New York conviction, the prosecution had nothing more to prove: "nothing remains but to give judgment and determine punishment." (*Boykin v. Alabama* (1969) 395 U.S. 238, 242; *People v. DeVaughn* (1977) 18 Cal.3d 889, 895.) We agree with respondent that defendant's admissions obviated any need for the prosecution to put on evidence of his New York robbery.

Pulling's next argument that the trial court did not properly advise him of his rights or warn him of the consequences of his guilty plea is waived. (*People v. Villalobos* (2012) 54 Cal.4th 177, 181-182; *People v. Jones, supra*, 178 Cal.App.4th at pp. 858-859.) The court in *Jones* noted, "[A]dvisement of the penal consequences of admitting a prior conviction is not constitutionally mandated. Rather, it is a judicially declared rule of criminal procedure. [Citations.] Consequently, when the only error is a failure to advise of the penal consequences, the error is waived if not raised at or before sentencing. [Citation.]" (*Jones,* at p. 858.) Because Pulling failed to assert the trial court did not properly advise him of the penal consequences of his admission, his claim is waived. (*Ibid.*)

Even absent waiver, Pulling's argument fails. This court reviews the entire record to determine whether Pulling's admissions were knowing and voluntary. (*People v. Mosby* (2004) 33 Cal.4th at 353, 361, 365, fn. 3.) Here the totality of the record demonstrates that Pulling's defense counsel explained what was happening and believed

14

Pulling understood his rights.[11] Even if the court did not remind Pulling of his right to confront witnesses or against self-incrimination concerning the priors, it does not establish the lack of a valid waiver. (*Mosby,* at pp. 364-365.) The record adequately demonstrates Pulling waived his right to a trial and admitted the New York robbery conviction constituted a prior strike.

IV

SENTENCING ON SECTION 667, SUBDIVISION (A), SECTION 667.5, SUBDIVISION (A), AND SECTION 667.5, SUBDIVISION (B), ENHANCEMENTS

Pulling and the People agree the trial court improperly imposed two sentence enhancements based on the New York robbery: five years on the prior serious felony enhancement (§ 667, subd. (a)) and three years on the prior prison term enhancement (§ 667.5, subd. (a)). The parties disagree about whether the three-year sentence should be stricken or stayed. Additionally, the parties disagree about whether the trial court should strike the one-year enhancement for a prior prison term under section 667.5, subdivision (b), based on Pulling's possession of contraband while incarcerated.

The probation report recommended imposing both the enhancements for Pulling's prior prison term for robbery and for his prior conviction for the New York robbery. The

---

[11] Although Pulling claims he was not legally qualified to make the subject admissions, he disregards the fact that he discussed the matter with his defense counsel. The court in *Thomas* rejected a similar contention, stating the record presumes advisement by counsel before the court takes an admission: "a defendant may plead guilty or admit an enhancement without having been informed of some critical matter, but that claim is best asserted by a petition for a writ of habeas corpus." (*People v. Thomas, supra*, 41 Cal.3d at pp. 843-844.)

report also stated the one-year enhancement for Pulling's prior prison term (§ 667.5, subd. (b)) should be stayed, citing *People v. Jones* (1993) 5 Cal.4th 1142. The court followed the recommendations of the probation report: imposing sentence enhancements for both the robbery conviction and the robbery prison term and imposing and staying the one-year enhancement, while expressing doubts about whether the sentence was appropriate.

We agree the trial court was required to impose the five-year enhancement mandated by section 667, subdivision (a), but could not increase Pulling's sentence with the three-year enhancement under section 667.5, subdivision (a). (*People v. Jones, supra,* 5 Cal.4th at pp. 1150-1151.) The trial court erred in imposing both the prior prison term and prior conviction enhancements for Pulling's New York robbery conviction. Instead, this court has held the proper procedure is to impose and stay, not strike, the second enhancement. (*People v. Lopez* [Fourth Dist., Div. Two] (2004) 119 Cal.App.4th 355, 364-366.) In *Lopez,* we noted that *Jones* did not address the issue of the trial court's handling of the prior prison term enhancement. (*Id.* at pp. 364-365; see also *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1130-1131.) We applied California Rules of Court, rule 4.447, to find the appropriate remedy was for the court to impose and then stay the sentence when two sentencing schemes exist. (*Lopez, supra,* 119 Cal.App.4th at pp. 364-366.) Thus the trial court should have stayed and not stricken the three-year prior prison term enhancement.

At the sentencing hearing the court commented the one-year enhancement (§ 667.5, subd. (b)) was "inappropriate." The clerk told the court that if it did not

16

"impose the stay," it would have to strike the enhancement. The court responded by stating, "[t]hen I will impose and stay it. I will impose and stay, but . . . it does not appear it's appropriate to me." However, contrary to the probation report, the court could impose the one-year enhancement without a stay because it was not based upon Pulling's robbery sentence but was based instead on his sentence for possessing contraband while incarcerated. Under section 1385, subdivision (a), the court did have discretion to impose or strike the one-year prior enhancement. (*People v. Garcia* (2008) 167 Cal.App.4th 1550, 1561.) The trial court "may not stay the one-year enhancement, which is mandatory unless stricken." (*People v. Langston* (2004) 33 Cal.4th 1237, 1241.) We conclude the trial court's intention regarding the one-year enhancement is ambiguous and we will not try to decide what is the more reasonable interpretation. Therefore, we will remand to the trial court to exercise its discretion either to impose or strike the section 667.5, subdivision (b), enhancement.

V

THE GUN-USE ENHANCEMENT

Pulling offers three related challenges to the gun-use enhancement, all of which depend on his factual interpretation of how Blackstone was robbed and which involve many of the same cases. Section 12022.53, subdivision (b), provides: "Notwithstanding any other provision of law, any person who . . . personally uses a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 10 years. The firearm need not be operable or loaded for this enhancement to apply." Pulling argues insufficient evidence supports the jury's finding he used a firearm during

17

the robbery. He also contends the trial court should have sua sponte instructed the jury on the lesser allegation of being armed with a firearm. Finally, he maintains the court gave the jury the wrong definition of "menacing."

Our analysis of these three arguments is guided by a deferential standard of review. This court resolves all conflicts in the evidence and questions of credibility in favor of the verdict, and indulges every reasonable inference the jury could draw from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053-1054.) The trier of fact may reasonably rely on the testimony of a single witness, unless the testimony is physically impossible or patently false. (Evid. Code, § 411; *People v. Cudjo* (1993) 6 Cal.4th 585, 609.)

With the foregoing in mind, we summarize the relevant facts as follows. During the August bank robbery of the Guaranty Bank, Librizzi watched as both Pulling and Dixon, armed with guns, stormed the bank, causing him to flee to the secure back room. Pulling and Dixon were yelling as they entered and pointing their weapons at the teller windows. The surveillance photographs show Pulling, holding the gun with the barrel extended in front of him, entering the bank behind Dixon. Librizzi was unable to move the teller, Blackstone, into the secure back room before he saw Pulling and Dixon shove their guns in Blackstone's face. Librizzi watched the robbery on the security monitor while Pulling and Dixon aimed their long-barreled guns at Blackstone. While pacing and wielding a gun, Pulling yelled that Blackstone was taking too long and should hurry. In fear for her life, Blackstone gave the robbers $11,000.

*A. Sufficiency of Evidence*

Pulling concedes he was armed but argues he did not "use" the gun; instead, he passively displayed it. The totality of the evidence, however, established that Pulling used the gun against Blackstone during the robbery. (*People v. Catlin* (2001) 26 Cal.4th 81, 139; *People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Ochoa* (2009) 179 Cal.App.4th 650, 657.) The prosecution did not need to prove the defendant pointed the gun at Blackstone or expressly threatened her with the gun: "'Personal use of a firearm may be found where the defendant intentionally displayed a firearm in a menacing manner *in order to facilitate the commission of an underlying crime*.' [Citation.]" (*People v. Thiessen* (2012) 202 Cal.App.4th 1397, 1405; *People v. Wilson* (2008) 44 Cal.4th 758, 806-807.) In *Wilson,* the court held, "'the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure. The defense may freely urge the jury not to draw such an inference, but a failure to actually point the gun, or to issue explicit threats of harm, does not entitle the defendant to a judicial exemption. . . .'" from the personal use enhancement. (*Wilson,* at p. 807, citing *People v. Granado* (1996) 49 Cal.App.4th 317, 325.)

In *Thiessen,* the defendant told the police that, even though he was armed and pulled the trigger of his shotgun, it did not fire, and his codefendant fired the wounding shots, which were fired from a car. (*People v. Theissen, supra*, 202 Cal.App.4th at pp. 1402-1403.) The court found sufficient evidence supported Thiessen's personal use enhancement, "[e]ven if the shotgun [was] inoperable and unseen by anyone else [when

19

Thiessen emboldened his codefendant to shoot.] He therefore *used* the firearm to facilitate the commission of the crimes." (*Id.* at p. 1404.)

In *People v. Bryant* (2011) 191 Cal.App.4th 1457, 1472, the defendant was holding a gun when he approached the victim and asked for her phone. She placed her phone on the trunk of her car. (*Id.* at pp. 1461-1462.) When Bryant ordered the victim to drive away, she complied. (*Id.* at p. 1462.) On appeal, the court upheld Bryant's personal firearm use enhancement, finding "the prosecution was not required to prove that defendant pointed the gun at [the victim] or expressly threatened her with the weapon." (*Id*. at p. 1472.)

Here the evidence established that Pulling was armed and displayed his gun in a menacing way to facilitate the robbery. Even if he did not point his gun directly at Blackstone, he certainly emboldened Dixon to threaten her with a gun and accomplish the robbery. Sufficient evidence amply supports the personal gun-use enhancement, in accordance with section 12022.53, subdivision (b).

B. *Lesser Included Enhancement*

As do the parties, we recognize that under present California law, the trial court does not have to give instructions sua sponte on lesser included enhancements. (*People v. Majors* (1998) 18 Cal.4th 385, 410-411; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Pulling raises the issue only to preserve it for further review.

Pulling argues that *Majors* was decided before, and thus did not consider, the United States Supreme Court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 and *Blakely v. Washington* (2004) 542 U.S. 296, 303.) Pulling's argument is

20

unavailing because neither *Apprendi* nor *Blakely* addresses a trial court's duty to instruct sua sponte on "lesser included enhancements," and *Majors* did not address a defendant's right to have a jury, and not a trial court, find facts on sentence enhancements. Consistent with *Apprendi* and *Blakely*, Pulling's jury, and not the trial court, made the factual findings that Pulling personally used a firearm when committing the robbery. Under *Majors*, the trial court had no sua sponte duty to instruct the jury on section 12022, subdivision (a)(1), as a lesser included enhancement of the personal use of a firearm enhancement under sections 12022.5 and 12022.53, subdivision (b). (*People v. Majors, supra,* 18 Cal.4th at pp. 410-411.)

Pulling also cannot establish deficient performance by trial counsel. Even if Pulling's counsel had requested the court to instruct on arming as a lesser included enhancement of gun use, the trial court should have rejected it as unsupported by the evidence. The evidence conclusively showed Pulling used the gun, even if Blackstone did not see him use it, or was actually unaware he used it. Pulling took action with the gun to facilitate the commission of the robbery and possession of it was more than incidental. (*People v. Granado, supra*, 49 Cal.App.4th at p. 325; see also *Alvarado v. Superior Court* (2007) 146 Cal.App.4th 993, 1005.) Therefore, considering the evidence presented at trial, Pulling fails to establish either deficient performance by his trial counsel or prejudice based on the fact he did not request an instruction on arming.

*C. Definition of Menacing*

The trial court also did not err in its definition of "menacing." During deliberations, the jury asked the court to define "menacing" and the parties engaged in a

21

lengthy discussion before the court decided that because Pulling was "in the bank with a rifle, and he's yelling, 'Hurry, hurry.' There is no innocent way he can be in that context in that bank. I'm going to answer the question 'represents or poses a threat' for answering 'menace.'"

Pulling argues the court should have instructed the jury that "menacing" means "threatening" instead of "represents or poses a threat." In *People v. Hays* (1983) 147 Cal.App.3d 534, the court found insufficient evidence to support a gun-use enhancement where a robber had a rifle on a sling over his shoulder, which frightened the victim. Pulling argues the rifle in *Hays* simply posed or represented a threat of use, not use itself.

We see little or no distinction between "threatening" and "represents or poses a threat." Nonetheless, Pulling is wrong because the court's definition correctly stated the prosecutor's burden for purposes of establishing "menacing" in the context of use of a firearm. As argued by the prosecutor and found by the trial court, "[t]he enhancement is not limited 'to situations where the gun is pointed at the victim . . . .'" (*People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1059 quoting *People v. Granado, supra*, 49 Cal.App.4th at p. 322.)

The court in *Granado* rejected the argument that a gun-use finding required awareness by the victim of the gun's presence. (*People v. Granado, supra*, 49 Cal.App.4th at p. 326.) The court specifically held, "If the defendant displays a gun to cow the victim, a use occurs at that moment, even if the victim is not cowed, or turns to run before seeing the gun or realizing it is present. Nor does such a rule cause section 12022.5(a) to subsume the lesser enhancement for being 'armed' under section 12022(a).

22

The requirement of gun-related *conduct* coupled with facilitative *intent* amply distinguishes use from mere possession." (*Id.* at pp. 328-329.)

The trial court's decision to define menacing as "represent or pose a threat" fits squarely within the analysis in *Carrasco* and *Granado* as well as *Bryant*. The proper focus concerns Pulling's conduct and his intent—and not Blackstone's perception or reaction to him. The jury already received instruction that to establish gun use, the prosecution needed to establish Pulling intentionally displayed the firearm. Therefore, the definition provided by the court required the jury to find Pulling intentionally displayed the firearm in a manner so as to represent or pose a threat.

Here Blackstone and Librizzi both testified the robbers aimed their guns at Blackstone and the surveillance photographs showed Pulling holding the rifle with the barrel aimed in front of him. The evidence demonstrated more than Pulling had "merely been armed with a firearm." Requiring the jury to find Pulling intentionally displayed the rifle in a manner which represented or posed a threat required more than finding Pulling only possessed a firearm. The trial court properly defined "menacing" in the context of the entire charge to the jury of the gun-use enhancement. No error occurred on this point.

VI

THE *PITCHESS* MOTIONS

Both Pulling and Dixon made *Pitchess* motions. The trial court denied Pulling's motion and granted Dixon's motion. We conclude Pulling failed to establish good cause in the trial court and the trial court did not abuse its discretion in finding none of the records sought by Dixon were discoverable.

23

*A. Pulling's Motion*

In his final argument, Pulling asserts evidence must have been planted because he was searched and handcuffed before being placed in the squad car and he denied having possessed a knife, a pair of gloves, and a baseball cap containing the dye-stained cash later found in the back of the squad car. Pulling asks this court to remand the matter for the trial court to conduct an in camera review of the officers' personnel files.

Pulling sought the personnel records of five police officers: Chief Williams, who drove him to the police station; Officers Paiz, Koahou, and Voeltz, who observed the items retrieved from the back seat of the squad car, and Sergeant Cole, who purportedly made a statement to Pulling when he got out of the transport squad car. The city attorney opposed the motion on three grounds: first, arguing Pulling failed to follow the requisites necessary to file a declaration under seal[12]; second, asserting Pulling failed to establish good cause for discovery of the officers' personnel records; and third, even if Pulling established good cause, his request was overbroad because he was only entitled to limited information.

In a two-day in camera hearing on Pulling's *Pitchess* motion, the court read the sealed declaration and considered questions submitted by the prosecutor. The court ruled the declaration should remain sealed as work product and privileged attorney/client information but that Pulling did not show good cause for discovery of the officers' files. Good cause for a *Pitchess* motion requires a two-part showing: first, a demonstration of

---

[12] The record on appeal includes Pulling's counsel's unredacted declaration.

24

the materiality of the information to the pending litigation; and second, a statement that the police agency has the records or information at issue. (§§ 832.7, 832.8; Evid. Code, §§ 1043 through 1045. (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1018-1019; *People v. Gaines* (2009) 46 Cal.4th 172, 179; *Pitchess, supra,* 11 Cal.3d at p. 531.)

Although the standards for showing good cause are "relatively relaxed," the declaration must set forth a "specific factual scenario" establishing a "plausible factual foundation" for the allegations of police misconduct. (*Warrick v. Superior Court, supra*, 35 Cal.4th at p. 1019.) The potential defense does not have to be credible or persuasive. (*People v. Gaines, supra*, 46 Cal.4th at p. 182; see *Warrick,* at p. 1026.) A defendant need only present a "plausible" scenario involving the alleged officer misconduct that could or might have occurred and that it is internally consistent. (*Warrick,* at pp. 1016, 1025-1026.) The defendant is required "to articulate how the discovery being sought would support such a defense or how it would impeach the officer's version of events." (*Id.* at pp. 1021, 1024.) Trial courts have broad discretion in ruling on such motions and should carefully balance the conflicting, substantial interests of the officers as well as the defendant. (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1043.) "If the defendant establishes good cause, the court must review the requested records in camera to determine what information, if any, should be disclosed. [Citation.]" (*Gaines,* at p. 179, citing *Chambers v. Superior Court* (2007) 42 Cal.4th 673, 679.) The trial court's exercise of discretion is reviewed under an abuse of discretion standard. (*People v. Cruz* (2008) 44 Cal.4th 636, 670; *People v. Giminez* (1975) 14 Cal.3d 68, 72.)

25

The trial court understood the requirement of good cause because it granted

Dixon's *Pitchess* motion. Pulling, however, cannot claim an abuse of discretion. Pulling

was required to explain his own actions in the light of all relevant circumstances in a

manner that adequately supported his defense. (*People v. Sanderson* (2010) 181

Cal.App.4th 1334, 1339-1340; *People v. Thompson* (2006) 141 Cal.App.4th 1312, 1317-

1318.) Pulling acknowledged being found in the getaway car with a rifle, being searched,

handcuffed and placed in the back of the squad car, and denying he had discarded the

baseball cap, red-dyed money, and a knife. Pulling did not deny being involved in the

robbery or deny the items found in the back seat were his. Therefore, the trial court could

reasonably conclude that Pulling failed to demonstrate sufficient good cause by

presenting a specific factual scenario that is plausible when read in light of the undisputed

circumstances. (*Sanderson,* at p. 1340, quoting *Thompson,* at p. 1316.)

In *Sanderson*, the defendant was charged with making criminal threats. The court

upheld the trial court's finding that Sanderson failed to establish good cause for

disclosure of *Pitchess* discovery. (*People v. Sanderson, supra*, 181 Cal.App.4th at p.

1336.) According to a police report, two police officers had heard Sanderson make

threats while he was on a speakerphone. In a declaration supporting the *Pitchess* motion,

Sanderson denied making the threatening statements. Sanderson sought personnel

records for the two officers relating to dishonesty and falsified police reports. (*Id.* at p.

1338.) The trial court denied the motion. The appellate court affirmed, noting Sanderson

simply denied making the statement attributed to him. He did not deny making the

telephone call in question and failed to present an alternate version of the facts regarding

the reason and nature of the telephone call with the victims. The court concluded "the trial court acted within its discretion to the extent that it made a 'common sense' determination that defendant's version of events was not plausible 'based on a reasonable and realistic assessment of the facts and allegations.' [Citation.]" (*Id.* at p. 1341.) Unlike the defendant in *Warrick*, Sanderson did not present a specific factual scenario of police misconduct. (*Id.* at p. 1342.)

In *Thompson*, a police report stated that six police officers witnessed an undercover officer conduct a drug transaction with Thompson. (*People v. Thompson, supra*, 141 Cal.App.4th at p. 1317.) In a *Pitchess* declaration, Thompson's counsel denied the officers recovered any buy money from Thompson, and Thompson did not offer or sell drugs to the undercover officer. Counsel further declared that police fabricated the alleged events and used drugs already in their possession, falsely claiming the drugs belonged to Thompson. (*Ibid.*) The trial court denied the *Pitchess* motion. On appeal, the court affirmed that Thompson failed to make a sufficient showing of good cause because his explanation did "not present a factual account of the scope of the alleged police misconduct, and [did] not explain his own actions in a manner that adequately support[ed] his defense." (*Ibid..*) While Thompson denied he possessed cocaine or received the buy money, he did not "state a nonculpable explanation for his presence in an area where drugs were being sold, [did not] sufficiently present a factual basis for being singled out by the police, or assert any 'mishandling of the situation' prior to his detention and arrest. Counsel's declaration simply denied the elements of the offense charged." (*Ibid.*)

27

Here Pulling's declaration was similarly inadequate. The declaration sets forth the circumstances of Pulling's arrest and denies Pulling deposited the items found in the back of the squad car but it fails to state a nonculpable explanation for his presence in the getaway car with the rifle, to deny the items were in his possession, or to explain how the purported misconduct would support a defense. (*People v. Thompson, supra*, 141 Cal.App.4th at p. 1317.) Therefore, Pulling fails to establish the trial court abused its discretion—that its decision exceeded the bounds of reason. (*People v. Giminez, supra*, 14 Cal.3d at p. 72.)

B. *Dixon's Pitchess Motion*

In his *Pitchess* declaration, Dixon asserts that the three officers who apprehended him lied when they said Dixon had pointed a shotgun at them as he fled from the getaway car. Directly contradicting Sergeant Cole, Officer Paiz and Commander Cole, defendant claimed that he did not draw or exhibit a firearm in violation of section 417.8. The trial court found that Dixon, unlike Pulling, made a sufficient showing which necessitated review of the officers' personnel records. After review, the trial court found no information subject to disclosure.

In his supplemental brief, Dixon asks this court to review the confidential personnel records the court reviewed after granting his *Pitchess* motion. We have reviewed the records considered by the trial court and determined the court did not abuse its discretion when it found no discoverable material in the officers' personnel records. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1232; *People v. Gaines, supra*, 46 Cal.4th at pp. 180-181.)

28

VII

DIXON'S STATEMENTS TO THE DETECTIVES

In different motions in Dixon's first two trials, he moved to suppress his confessions to the three robberies. Dixon contends the trial court erred in the second trial involving the June robbery by allowing the admission of his confession made on August 20, 2007, during his third interview with Officer Essex. He maintains the confession was coerced because the police impliedly promised to release his sister if he confessed and because the police made implied threats and promises of leniency for him. Dixon forfeited the former argument because he did not raise it below when challenging the admission of his confession to the June robbery. Moreover, he fails to establish the trial court abused its discretion when rejecting his argument that the detectives made implied promises of leniency.

*A. Dixon's Confession to the August Robbery*

In postarrest questioning on August 17, 2007, Dixon first confessed to the August robbery; then, in a second interview on August 20, 2007, he confessed to the June robbery. In August 2011, before Dixon's first trial involving the August robbery—and the second robbery of the Guaranty Bank—Dixon filed a pretrial motion to exclude his first confession. Dixon acknowledged waiving his *Miranda*[13] rights and signing a valid waiver but he claimed the officers used coercive techniques by promising they would help his sister if he confessed. Dixon felt badly about involving her. Detective Essex

---

**13** *Miranda v. Arizona* (1966) 384 U.S. 436.

29

denied making any promises or threats, handcuffing Dixon, or physically touching him. No promises were made about Dixon's sister. On cross examination, Dixon's counsel asked Essex if Dixon was told, "'You might be able to help her out a lot by just telling us everything that happened'?" Detective Essex answered, "I believe I did, something to that effect, meaning that by knowing the truth for both situations that we could get to the bottom of it." The court denied Dixon's motion and found no coercion occurred during Dixon's August 17, 2007 interview and that Dixon's statements were freely and voluntarily made.

B. *Dixon's Confession to the June Robbery*

Before Dixon's second trial involving the June robbery—the first robbery of the Guaranty Bank—the prosecutor sought to admit Dixon's confession on August 20, 2007. Dixon challenged the admission of his confession during an Evidence Code section 402 hearing.

Detective Essex testified that, before the August 17, 2007 interview, he fully admonished Dixon in accordance with *Miranda*. Following the admonishment, Dixon agreed to speak and he also signed a preprinted *Miranda* advisement waiver. Because of similarities between the June and August robberies of Guaranty Bank, Detective Essex then contacted Dixon on August 20, 2007, while he was in jail in Palm Springs, and reminded him of his rights. Dixon agreed to talk to Detective Essex, accompanied by Detective Stewart. Essex did not admonish Dixon again and did not have him sign another waiver. After the interview, the detectives were leaving the jail when a custodian

30

stopped them and told them Dixon wanted to talk to them again. During his second interview, Dixon confessed to the June robbery.

The prosecution argued that the confession was properly admissible because Dixon was admonished of his *Miranda* rights on August 17, 2007, reminded of those rights before the August 20, 2007 interviews, and the interview tapes established Dixon was not promised leniency and not coerced. Dixon's counsel argued Dixon should have received full *Miranda* admonishments again because his previous admonishment occurred three-and-one-half days earlier. Dixon's counsel argued the detectives coerced when they told him to "man up"; that there could be leniency in sentencing; that he could help himself by cooperating; and, when he went to prison, he could get "rehab, less time." The trial court rejected Dixon's arguments that he was coerced because, in spite of mentioning leniency, no promises were made by the detectives. Nor should Dixon have been admonished again in accordance with *Miranda* because his statement was free and voluntary and he gave a knowing waiver of rights.

## C. *Leniency for Dixon's Sister*

On appeal, Dixon contends the detectives promised his sister would be treated with leniency for her part in the August robbery if he confessed to the June robbery. The record shows Dixon never argued below the investigators promised leniency for his sister in connection with the June robbery but, instead, made this argument concerning the admissibility of his confession to the August robbery. Because Dixon failed to make the argument below, which he now makes on appeal, it should be forfeited. (*People v. Riccardi* (2012) 54 Cal.4th 758, 802.)

31

Notwithstanding forfeiture, the record also does not support that the detectives offered leniency for Dixon's sister when questioning him about the June robbery. Dixon reasons that, because his sister was not involved in the June robbery, he believed he had nothing to lose by confessing to that robbery and he chose to bargain his freedom for his sister's. But the record does not support this imaginative explanation. When detectives brought up inconsistencies in Dixon's statements about the August robbery, they also mentioned executing a search warrant on Dixon's sister's car, which implicated her and established Dixon had lied when giving his August 17, 2007 statement. The detectives were not trying to threaten Dixon about what would happen to his sister if he did not confess to the June robbery but, rather, explaining why they believed he was lying to them. When Dixon continued to deny his involvement, the detectives ended the interview. Nothing in the detectives' statements indicated that Dixon could benefit his sister by pleading guilty to the June robbery.

Instead, Dixon initiated the second part of the interview on August 20, 2007, during which he confessed to the June robbery. When Dixon called the detectives back to talk, he asked immediately, "[w]hat's gonna happen to my sister?" The detectives reiterated what they had already said. When Dixon asked, "[h]ow do I get my sister out of this?", Detective Essex answered, "There isn't any. There is a way we might be able to soften the impact but I can't make any promises to you on that. That's all up to the district attorney." While the detectives focused on Dixon's involvement in the June robbery, Dixon persisted in asking about his sister until the officers told him they had no

control over what happened to her. They reiterated that it was beyond their ability and Dixon needed to be truthful about his involvement in the June robbery.

Exhorting Dixon to tell the truth because he lied about the August robbery does not constitute coercion. (*People v. McWhorter* (2009) 47 Cal.4th 318, 357-358.) This was not a situation in which Dixon's confession to the June robbery could exonerate his sister in the August robbery. At most the detectives offered to talk to the district attorney but clearly made known to Dixon the fact they had no control over his sister's fate. Assuming Dixon did not forfeit his argument about coercion, the argument still fails.

## D. Leniency for Dixon

Dixon also contends he was promised leniency for confessing to the June robbery. The record reflects the detectives strongly urged Dixon to tell the truth, which would benefit him in the long run.

Well-established principles govern challenges to the voluntariness of a statement and review of the issue on appeal. (*People v. McWhorter, supra*, 47 Cal.4th at p. 346.) The prosecution must prove by a preponderance of the evidence a defendant's statement was voluntary. (*Ibid.*) The test for involuntariness is whether "'the defendant's "will was overborne at the time he confessed." (*Lynumn v. Illinois* (1963) 372 U.S. 528, 534.)'" (*People v. Maury* (2003) 30 Cal.4th 342, 404; *McWhorter,* at pp. 346-347.) In reviewing whether such statements were voluntary, this court independently reviews the uncontradicted facts, upholding "'the trial court's findings as to the circumstances surrounding the confession . . . if supported by substantial evidence.'" (*People v. Holloway* (2004) 33 Cal.4th 96, 114.) When the interview is tape-recorded, the facts are

33

undisputed and this court may independently review the determination of voluntariness. (*McWhorter,* at p. 346.)

The court in *McWhorter* held a finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions. A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. (*People v. McWhorter, supra*, 47 Cal.4th at p. 347.)

Dixon asserts the detectives pressured him psychologically by commenting about leniency in sentencing and by stating that when he went before the judge he would have "other charges coming at you" so it was better to cooperate so the detectives "could make something go away."

Psychological pressure, however, is not the equivalent of overbearing the will to such an extent that a suspect is unable to resist and utters a false confession. (*People v. Maury, supra*, 30 Cal.4th at p. 404.) Consideration of the record shows that nothing the detectives said constituted psychological coercion or influence to overbear Dixon's will to resist and to cause him to confess. (*People v. McWhorter, supra*, 47 Cal.4th at p. 374.)

In *Holloway,* the jury convicted the defendant of first degree murder for slaying two girls, the attempted rape of one of them, burglary and special circumstances. (*People v. Holloway, supra*, 33 Cal.4th at p. 104.) Physical evidence placed Holloway at the murder scene and the court admitted "partial admissions" that Holloway had discovered the bodies of the victims but in which he did not expressly confess to any of the crimes. (*Id.* at pp. 103-104.) On appeal, the court upheld the admission of Holloway's statement,

stressing the fact that he had voluntarily waived his *Miranda* rights in an effort to address a false alibi he had previously given. The only real question was whether "the detectives' mention of a possible death penalty and suggestions that defendant would benefit from giving a truthful, mitigated version of the crimes . . . constituted implied threats and promises of leniency sufficient to render the subsequent admissions involuntary." (*Id.* at p. 115.) The court found no implied promises had been made: "[M]ere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary." (*Ibid.*)

Dixon confessed to two crimes, the July and August robberies. The detectives reminded him of his *Miranda* rights before they spoke with him again on August 20, 2007. When they asked him whether he was involved in the June robbery, and he denied involvement, they confronted him with the inconsistencies in his August 16, 2007 statement, which led them to discredit his denial of involvement in the June robbery. They also told him the inconsistencies between the three robberies led them to believe he was involved in all of them and they urged him to be truthful. As in *Holloway*, detectives Essex and Stewart exhorted Dixon to tell the truth and suggested he might benefit by being truthful. The detectives made no promises of leniency if he confessed. Dixon's confession to the June robbery was properly admitted.

VIII

THE BATSON/WHEELER MOTION

Both defendants claim they were denied their right to a jury based on a cross-section of the community due to the prosecutor's exercise of peremptory challenges to excuse four Hispanic jurors not based on race-neutral reasons.

Defense counsel for Pulling argued the prosecutor had exercised six peremptory challenges[14] to excuse Hispanic-surnamed jurors, asserting that none of them said anything indicating a bias for or against the prosecution. The court found defense counsel failed to establish a prima facie showing. The court reasoned that both sides had excused Hispanics and some Hispanics remained on the panel.

The prosecutor noted he was Hispanic and neither of defendants were Hispanic. The prosecutor then gave reasons for excusing the five jurors. The prosecutor stated Mr. Z. had been late to court twice and delayed the proceedings both times. The prosecutor excused Ms. C. because she was a DPSS worker, and DPSS workers in his experience did not make good jurors because they focused on resolving issues through mutual resolution, as opposed to assigning guilt or innocence, and because she had a nephew with a recent DUI. The prosecutor excused Mr. Av. because, when asked whether he could be fair, he responded brusquely, "I can be fair enough." The prosecutor excused Mr. Ar., noting he just graduated from high school and he indicated he would tend to follow the lead of more mature jurors and not necessarily decide for himself. The

---

**14** The prosecutor pointed out that one of the peremptory challenges defense counsel attributed to him was actually exercised jointly by the defense.

prosecutor excused Ms. Al. because of her demeanor and when Pulling's counsel asked questions she appeared reluctant to answer them and participate.

Defense counsel did not contradict or rebut any of the prosecutor's stated reasons. The court repeated its original holding that the defense failed to make a prima facie showing.

A claim the prosecution exercised peremptory challenges on the basis of group bias involves a three-step process. (*People v. Streeter* (2012) 54 Cal.4th 205, 221; *People v. Lenix* (2008) 44 Cal.4th 602, 612-613.) First, the trial court determines whether the defendant has made a prima facie case showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination. (*Lenix,* at pp. 612-613; see also *Streeter,* at p. 221.)

This court reviews the trial court's denial of a *Wheeler/Batson* motion with deference, "examining only whether substantial evidence supports its conclusions." (*People v. Lenix, supra*, 44 Cal.4th at p. 613.) Evidence must be sufficient to support an inference of a discriminatory purpose. (*People v. Garcia* (2011) 52 Cal.4th 706, 746, citing *Johnson v. California* (2005) 545 U.S. 162, 168.) Only when the record is unclear about what standard the trial court used to make its prima facie determination does this court conduct an independent review of the record to determine whether it shows an inference that the prosecutor excused jurors for prohibited discriminatory reasons. (*Garcia,* at p. 747.)

37

Here, the trial court employed a standard consistent with the reasonable inference standard in *Garcia* and *Johnson*. Initially, the court found the prosecutor had not been uniformly excusing Hispanic potential jurors. When reiterating its determination that Pulling failed to establish a prima facie showing, the trial court asserted there was no pattern of excusing Hispanic jurors. Substantial evidence supports the trial court's determination.

The trial court concluded that Pulling failed to make a prima facie case of discrimination based on the prosecutor's peremptory challenge of five prospective Hispanic jurors after the prosecutor exercised a peremptory challenge to excuse Prospective Juror No. 10 (Mr. Ar.). Both sides had exercised peremptory challenges to excuse the Hispanic potential jurors and several Hispanics remained on the panel which the prosecutor accepted. The record establishes the prosecutor accepted the jury panel once with at least one Hispanic juror and twice with at least two Hispanic jurors.

Defense counsel did not dispute the court's factual findings. Defense counsel's *Wheeler* motion asserted, without specifics, that the prosecutor had excused the Hispanic jurors without these jurors either favoring or showing bias against the prosecutor. Therefore, the trial court's finding that defense counsel failed to establish a prima facie showing should be upheld. (*People v. Clark* (2011) 52 Cal.4th 856, 905.)

For the first time on appeal, Dixon attempts to rebut the prosecutor's reasons for exercising four of the five peremptory challenges. In *People v. Hawthorne* (2009) 46 Cal.4th 67, 78-80, after the prosecutor stated his reasons on the record, the court found defense counsel failed to establish a prima facie showing and did not make a ruling on the

38

prosecutor's reasons for exercising the peremptory challenges. (*Id.* at pp. 78-79.) The court in *Hawthorne* concluded the prosecutor's race-neutral reasons confirmed the trial court's finding that insufficient evidence supported an inference that discrimination occurred. (*Id.* at p. 80.) The court declined to engage in comparative analysis for the first time on appeal. (*Id.* at p. 80, fn. 3.) *Hawthorne* stands in contrast to those cases in which the court invited the prosecutor to state reasons on the record for the excusals, then found a failure to make a prima facie showing, while nonetheless making a ruling on the prosecutor's reasons. (*People v. Mills* (2010) 48 Cal.4th 158, 174.)

Here, as in *Hawthorne*, even though the prosecutor gave reasons for excusing the jurors, the court found defense counsel failed to establish a prima facie showing. Where the court makes a determination on the prosecutor's reasons, the trial court's determination of no prima facie showing is rendered moot. (*People v. Mills, supra,* 48 Cal.4th at p. 174.) Nevertheless, the prosecutor's uncontradicted reasons for the five excusals support the trial court's determination that defense counsel failed to make a prima facie showing. (*Hawthorne, supra*, 46 Cal.4th at p. 80.)

The trial judge observes voir dire and is in the best position to determine whether under all relevant circumstances a prima facie showing has been made. (*People v. Box* (2000) 23 Cal.4th 1153, 1189.) Because the prosecutor's race neutral-reasons corroborate the trial court's determination, substantial evidence supports the trial court's finding that defense counsel failed to establish the first step of a prima facie showing necessary for a *Wheeler* motion.

IX

CONCLUSION

We remand and order the trial court to stay the three-year prior prison term enhancement the trial court imposed for Pulling's New York robbery conviction and remand for the trial court to exercise its discretion whether to impose a one-year prior prison term enhancement for Pulling's New York possession of contraband conviction. We have reviewed the documents considered by the trial court after granting Dixon's *Pitchess* motion and found no discoverable information. We reject the rest of the arguments raised by Pulling and Dixon on appeal and affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

RICHLI
J.